Orville Lynn WEBB, M.D., Defendant–Appellant,

v.

Thomas D. JARVIS and Madeline Jarvis, Plaintiffs–Appellees,

Henry County, Henry County Sheriff's Department and Board of Commissioners of Henry County, Defendants–Appellees.

No. 53A01–8907–CV–244.

Court of Appeals of Indiana, First District.

April 23, 1990.

Rehearing Denied June 5, 1990.

---

Richard L. Fairchild, Stephen J. Peters, Stewart & Irwin, Indianapolis, for defendant-appellant.

Henry J. Price, Jerry Garau, Price & Shula, Indianapolis, for plaintiffs-appellees.

BAKER, Judge.

In this interlocutory appeal, defendant-appellant, Orville Webb, M.D. (Dr. Webb) appeals the trial court's denial of his motion for summary judgment. Dr. Webb moved for summary judgment against plaintiff-appellees, Thomas and Madeline Jarvis (Jarvis),[1] in their suit arising from Dr. Webb's treatment of a patient who shot Jarvis. We affirm in part and reverse in part.

Dr. Webb, who also holds a Ph.D. in pharmacology, is a family practitioner in New Castle, Indiana. In November of 1977, Dr. Webb became Michael Neal's (Neal) physician. Though not trained in psychiatry or psychotherapy, Dr. Webb diagnosed Neal as suffering from chronic anxiety and depression. He treated Neal for these problems by liberally prescribing various psychotropic drugs including libri-um, valium, and tofranil. Dr. Webb also regularly prescribed anabolic steriods for Neal and frequently allowed Neal to take dosages greatly in excess of the manufacturer's recommended dosage. Neal took the steroids to gain weight and enhance his performance in the Police Olympics. Dr. Webb prescribed the steriods to give Neal a "running start" for the Police Olympics. Additionally, Neal received numerous testosterone injections from Dr. Webb.

Neal became a Henry County Deputy Sheriff in 1981 and had work-related access to weapons until he was disabled in early 1985. He also had a large personal gun collection. During 1984 and early 1985, Neal beat his wife, Rhonda, approximately once a month and pointed a gun at her on one occasion. He also threatened to kill her if she told anyone about his violent tendencies. Dr. Webb, however, was unaware of Neal's behavior and he did not believe Neal presented a danger to anyone.

On March 27, 1985, Neal twice threatened his wife with a knife and pointed an unloaded gun at her head and pulled the trigger. After this altercation, Rhonda went to the Jarvis residence because Madeline is Rhonda's sister. Jarvis was and is an Indiana State Police Detective.

The next day, after Rhonda told Jarvis about the incident, he notified Major McCorkle (McCorkle) of the Henry County Sheriff's Department who called Dr. Webb (who also worked on a retainer basis for Henry County, providing medical treatment to prisoners at the county jail) for assistance. Dr. Webb went to the sheriff's office and consulted with McCorkle, Jarvis (whom Dr. Webb then met for the first time), and the sheriff. McCorkle then telephoned Neal and asked if he (McCorkle) could visit Neal or if Neal would visit the sheriff's office. Neal refused both requests and threatened to shoot anyone who approached him, but assented to seeing Dr. Webb after Dr. Webb asked whether Neal would allow him to visit.

---

1. Because Madeline's claims are derivative of her husband's, we refer to him individually throughout this opinion.

When Dr. Webb went to Neal's house, Neal was armed and Dr. Webb described him as upset and distraught. Dr. Webb suggested hospitalization and he and Neal eventually compromised with Neal's promise to see a psychologist whom Dr. Webb knew on the following day. Neal then said he would take a sleeping pill and go to bed. Dr. Webb left Neal saying he would telephone Neal the next morning regarding an appointment with the psychologist. Upon returning home, Dr. Webb telephoned McCorkle and told him that Neal had agreed to get psychiatric help the next morning but that he should not be approached before that time.

Despite Dr. Webb's admonitions, McCorkle called Rhonda and told her everything was all right and that she could go home to get a change of clothing. Rhonda and Jarvis confirmed McCorkle's report by talking on the phone with Neal who said it was all right for them to come to the house. Jarvis accompanied Rhonda and wore a pistol as was his custom. After their arrival at Neal's house, Rhonda began collecting her belongings while Neal and Jarvis spoke. Neal left the room, returned with a rifle and pointed it at Jarvis saying, "Goodbye, Tommy." Rhonda began screaming and Jarvis grabbed Neal. In the ensuing scuffle, Rhonda escaped. Neal broke free from Jarvis and as Jarvis ran out the door Neal shot him.

Jarvis reached his vehicle and tried to radio for assistance but Neal shot him again, firing approximately 30 rounds. Jarvis managed to wound Neal and struggle to a neighbor's house for assistance. Neal stole Jarvis' car, went to the Henry County Hospital, and was apprehended by police after he wounded another police officer and shot and killed a nurse.

Jarvis received insurance and disability benefits from the police pension fund for his injuries. He and his wife now seek recovery from Dr. Webb.[2] Dr. Webb moved for summary judgment and the trial court denied the motion and certified its interlocutory order for appeal to resolve the questions of law presented in this case.

## STANDARD OF REVIEW

At the outset, we note our standard of review. A grant of summary judgment under Ind. Trial Rule 56(C) is proper only "if the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, ... together with any testimony show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The movant bears the burden of proving the absence of any issue of material fact and all reasonable inferences must be resolved in favor of the non-movant. *Kidd v. Davis* (1985), Ind.App., 485 N.E.2d 156. On review, we apply the same standard as the trial court. *Ogden Estate v. Decatur County Hosp.* (1987), Ind.App., 509 N.E.2d 901, *trans. denied.*

Jarvis premises his suit against Dr. Webb on negligence. For actionable negligence to be present, a plaintiff must prove three elements: (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff; (2) a breach of that duty; and (3) an injury to the plaintiff resulting from the breach. *Hatton v. Fraternal Order of Eagles* (1990), Ind.App., 551 N.E.2d 479, 480. The existence of a duty is a question of law, *Neal v. Home Builders, Inc.* (1953), 232 Ind. 160, 111 N.E.2d 280, and our review in this case is limited to the question of whether Dr. Webb owed a duty or duties to Jarvis. The factual questions of breach and injury are to be resolved at trial.

## I. DUTY TO WARN

We turn now to the first issue for our review; namely, whether Dr. Webb had a duty to warn Jarvis of Neal's violent tendencies. Jarvis raised this issue in the pleadings, but abandoned it on appeal. *Appellee's Brief* at 8. In determining the theory of a case, we "may look to the

---

2. Jarvis also brought suit against Henry County, the Henry County Sheriff's Department, and the Board of Commissioners of Henry County, but none of these defendants is a party to this appeal.

pleadings, the entire record, and briefs of counsel." *Knight & Jillson Co., et. al. v. Miller* (1909), 172 Ind. 27, 32, 87 N.E. 823, 826. After reviewing the record, we have concluded this case does not involve a duty to warn issue and we will not consider it further.[3]

## II. DUTY TO JARVIS

Next, we turn to the question of Dr. Webb's duty to Jarvis arising from his duty as Neal's physician. Jarvis asserts Dr. Webb negligently overmedicated Neal with anabolic steroids and testosterone to the point that Neal became a toxic psychotic resulting in Neal's attack on Jarvis, a foreseeable victim. Dr. Webb argues that even if his treatment of Neal was negligent, he owed no duty to Jarvis resulting from his treatment of Neal. We agree with Jarvis that Dr. Webb owed a duty to Jarvis as a foreseeable plaintiff under Indiana law.

### A. *Privity*

■ Dr. Webb argues he had no duty to Jarvis because he and Jarvis were not in privity. In *Hiatt v. Brown* (1981), Ind. App., 422 N.E.2d 736, this court held an architect could be found liable for negligently designing an airport pedestrian ramp when the plaintiff was knocked over and injured by the backwash of a jet engine. The architect's design created "a condition imminently dangerous to third persons," *Id.* at 740, and we found the lack of privity was not a barrier to the plaintiff's claim. So it is here. Dr. Webb's negligence[4] created a condition (the aggressive toxic psychosis of an excessive steroid and testosterone user) imminently dangerous to third persons and the absence of privity between Dr. Webb and Jarvis is not a bar to Jarvis' claim.

We are not persuaded by Dr. Webb's contention that this court's holding in *Essex v. Ryan* (1983), Ind.App., 446 N.E.2d 368 requires privity or Dr. Webb's knowledge of Jarvis for Jarvis to maintain this action. In *Essex* the plaintiff's negligence theory was disallowed because the plaintiff

landowner was not in privity with the defendant surveyor who made an inaccurate survey of the land. The survey was made for the plaintiff's remote grantor and the defendant had no knowledge of the plaintiff and plaintiff's reliance on the survey. Dr. Webb asserts his lack of knowledge of Jarvis' reliance on his treatment of Neal puts him in a position analogous to that of the surveyor in *Essex*. The *Essex* court, however, approvingly cited *Hiatt*, drew an important distinction between a survey and cases involving physical injury, and limited its holding because of "concerns which may be involved with respect to the liability of other professionals." *Id.*, at 372–73. *Essex* is not controlling.

### B. *Foreseeability*

■ Dr. Webb also argues he owed no duty to Jarvis because Jarvis is not a foreseeable plaintiff. He is mistaken. "Foreseeability does not mean that the precise sequence of events or exact consequences which were encountered should have been anticipated. Rather, the question is whether [the] defendant should have foreseen in the abstract, in a general way, the injurious consequences of its act." *Hobby Shops, Inc. v. Drudy* (1974), 161 Ind.App. 699, 708, 317 N.E.2d 473, 478. This standard of foreseeability has led to liability for physicians when their overmedicated or epileptic patients have caused automobile accidents. *See Duvall v. Goldin* (1984), 139 Mich.App. 342, 362 N.W.2d 275, *appeal denied*. Like the patient auto driver in *Duvall*, Neal was unable to control his behavior and posed a threat to those with whom he had contact. Like the injured plaintiff in *Duvall*, Jarvis, by virtue of coming into contact with Neal, was a foreseeable victim of Neal's uncontrolled behavior.

■ Dr. Webb attempts to distinguish *Duvall* and other cases in which physicians have been held liable for auto accidents caused by overmedicated or epileptic patients from the facts here, in which an

---

3. Although Jarvis cannot argue the issue of Dr. Webb's duty to warn at trial, he may argue this issue against the other defendants.

4. At oral argument, Dr. Webb conceded negligence for purposes of this appeal.

assault occurred.[5] He argues that while physicians should reasonably foresee an auto accident resulting from a patient's impaired driving abilities, they cannot foresee a patient's assault on a third person simply by virtue of negligent overmedication. He relies here on this court's holding in *Welch v. Railroad Crossing, Inc.* (1986), Ind.App., 488 N.E.2d 383. In *Welch* the defendant tavern owner was held not liable for one patron's intentional assault upon another. The plaintiff could not recover because the assault was a volitional act which broke the causal chain between the tavern's provision of alcohol to the assaulter and the plaintiff's injuries. The plaintiff "presented no evidence to show that intoxication was a catalyst of [the defendant's] assault." *Id.* at 391. Dr. Webb is correct that if Neal's assault upon Jarvis was an intentional, volitional act and not a result of Neal's toxic psychosis, Dr. Webb will not be liable to Jarvis. If, however, Jarvis proves Neal was a toxic psychotic and that the psychosis was the result of Dr. Webb's negligent overmedication, then the volitional element required to break the causal chain will be missing, and *Welch* will afford Dr. Webb no refuge. As we stated recently, "[o]ne who gives matches to a pyromaniac can hardly claim that it could not be exactly foreseen what or whom he might harm or in what strange manner or how long it might take him to light the fire." *Rubin v. Johnson* (1990), Ind.App., 550 N.E.2d 324, 332 (citations omitted).

### C. *Applicability of Medical Malpractice Act*

■ At oral argument, Dr. Webb contended our holding in *Midtown Community Mental Health Center v. Estate of Gahl* (1989), Ind.App., 540 N.E.2d 1259 prevents third parties from recovering for damages proximately caused by a physician's failure properly to medicate and supervise a mentally disturbed patient. Dr. Webb is incorrect. *Midtown* revolved solely around a third party plaintiff's need to comply with the procedural requirements of the medical malpractice act.[6] As Chief Judge Ratliff stated, "[a]ssuming that the defendants had a duty to properly medicate and supervise [the patient], we believe that a breach of that duty could constitute malpractice as to [the patient], but not as to third parties with whom [he] might come into contact." *Id.* at 1262. *Midtown* only prevents Jarvis from suing Dr. Webb for malpractice; it does not preclude a negligence suit.

### D. *Fireman's Rule*

In his final argument on this point, Dr. Webb asks us to extend the Fireman's Rule to prevent Jarvis from recovering against him. "The Fireman's Rule is an exception to the liability imposed on a party under the rescue doctrine." *Sports Bench, Inc. v. McPherson* (1987), Ind.App., 509 N.E.2d 233, 234, 235, *trans. denied.* The rescue doctrine, first enunciated by our supreme court in *Neal v. Home Builders, Inc.* (1953), 232 Ind. 160, 111 N.E.2d 280, provides that "one who has, through his negligence, endangered the safety of another may be held liable for the injuries sustained by a third person in attempting to save such other from injury." *Id.* at 167, 111 N.E.2d at 284 (quoting 65 C.J.S. *Negligence,* § 63, at 554). Recently, our supreme court affirmed that the rescue doctrine is applicable to negligence actions. *Lambert v. Parrish* (1986), Ind., 492 N.E.2d 289, 291.

■ The central thrust of the Fireman's Rule is that "professionals, whose occupations by nature expose them to particular risks, may not hold another negligent for creating the situation to which they respond in their official capacity." *Koehn v. Devereaux* (1986), Ind.App., 495 N.E.2d 211, 215. The rule applies to acts within the scope of the official's duty undertaken in a rescue situation regardless of whether

---

**5.** *See e.g. Watkins v. United States* (1979), 5th Cir. 589 F.2d 214; *Freese v. Lemmon* (1973), Iowa, 210 N.W.2d 576; *Welke v. Kuzilla* (1985), 144 Mich.App. 245, 375 N.W.2d 403, *appeal denied.*

**6.** IND.CODE 16–9.5–9–1.

the official is on duty. *Sports Bench, supra,* at 235.

■ The facts most favorable to Jarvis, the non-movant, reveal that no rescue was involved to make the Fireman's Rule applicable here. Jarvis accompanied Rhonda to the Neal home as her brother-in-law, not as a state police officer. He carried a revolver because it was his custom to do so, *Record* at 253, and he did not anticipate difficulty with Neal. Rather, Jarvis thought the situation was a "typical family thing" akin to a marital dispute he had helped Neal and Rhonda resolve a few years earlier. *Record* at 256. When Neal displayed the rifle, he threatened Jarvis, not Rhonda. Simply because Jarvis may well have saved Rhonda as an incident to saving himself does not create the rescue situation contemplated by the Fireman's Rule.[7] We hold that when a police officer rescues someone as an incident to saving himself, the Fireman's Rule will not act as a bar to later attempts at recovery. The rescue situation contemplated by the rule must exist at the outset of the incident.

■ If evidence at trial reveals that Jarvis did engage primarily in a rescue of Rhonda, the Fireman's Rule nonetheless does not bar his claim. In all the Indiana cases involving the Fireman's Rule, the defendants immunized by the rule were victims. In *Woodruff,* which is the earliest Indiana case on the Fireman's Rule, the defendant's Indianapolis warehouse was destroyed by fire. The widow of a fireman killed when the roof of the warehouse collapsed was prohibited from recovering because our supreme court held her deceased husband was a licensee to whom the defendant owed only the duty of refraining from willful or wanton conduct. In *Pallikan,* the defendant also suffered a property loss due to fire. In *Koehn,* which extended the Fireman's Rule to off-premises cases, the

defendant public utility suffered damages to its power lines. The other defendants were a business whose truck was damaged by the power lines and the estate of the business' employee killed by the power lines. In *Sports Bench,* the defendant suffered a loss to its business when a patron fired a pistol and wounded the plaintiff sheriff's deputies. Finally, in *Koop* the defendant had been shot by his mentally disturbed son who then barricaded himself inside the defendant's house and subsequently shot an Allen County Police Department Special Weapons and Tactics team member.

The Fireman's Rule exists to protect such victims by encouraging them to summon firefighters and police officers for needed emergency assistance. Without the Fireman's Rule, such victims would be subjected to tort liability in addition to suffering the tragedy of their loss.

Dr. Webb, on the other hand, is not a victim. The shooting incident caused no harm to either his person or his property. Indeed, unlike all the defendants in the cases cited, Dr. Webb had no personal or property interest at stake in the incident.

Allowing Dr. Webb to seek haven in the Fireman's Rule would be akin to releasing an arsonist from liability to an injured firefighter. *Woodruff* and its progeny have never been construed to reach such a result. In *Koehn,* for example, if someone had deliberately toppled the power lines, the application of the Fireman's Rule to the public utility that owned the lines would not mandate the application of the rule to the tortfeasor. The Fireman's Rule is designed to protect a class of persons, i.e., victims, and we will not extend it to Dr. Webb and similar non-victims.

To paraphrase what we said in our discussion of foreseeability: Dr. Webb gave the matches to the pyromaniac Neal. We

---

**7.** In addition to *Koehn, supra,* which involved an off-duty fireman aiding a motorist endangered by downed power lines, and *Sports Bench, supra,* in which two off-duty sheriff's deputies waited at a tavern to observe a parolee and agreed to help a tavern worker anticipating a breach of the peace, every Indiana case addressing the Fireman's Rule involved a rescue. *See*

*Woodruff v. Bowen* (1893), 136 Ind. 431, 34 N.E. 1113 (fireman on premises to fight fire); *Pallikan v. Mark* (1975), 163 Ind.App. 178, 322 N.E.2d 398, *trans. denied* (fireman on premises to fight fire); and *Koop v. Bailey* (1986), Ind. App., 502 N.E.2d 116 (policeman on premises in hostage rescue situation).

will not allow Dr. Webb to reap a windfall from the Fireman's Rule merely because Neal's use of the matches harmed a police officer.

 Dr. Webb raises a final argument regarding the Fireman's Rule. Jarvis received medical expense reimbursements from the Indiana State Police (ISP) Pension Program for injuries received in the line of duty. Dr. Webb argues this binds Jarvis to the position that he acted in the line of duty for purposes of the Fireman's Rule. Dr. Webb relies here on this court's holding in *Riverview Health Care v. Wright* (1988), Ind.App., 524 N.E.2d 321. In light of our holding that Dr. Webb is not in a position protected by the Fireman's Rule, whether Jarvis acted in the line of duty is a moot point. Additionally, *Riverview* is inapplicable to the facts here.[8] In *Riverview*, the injured employee/plaintiff was barred from seeking workmen's compensation benefits when in earlier litigation she had successfully argued that the Industrial Board of Indiana had no jurisdiction over her claim.

Unlike workmen's compensation benefits, State Police medical expenses reimbursements are not an exclusive remedy and do not entail the ISP's Pension Advisory Board taking exclusive jurisdiction over a claim. IND.CODE 10-1-2-4. The record here does not reveal that an evidentiary hearing was ever held on Jarvis' application for reimbursement. Moreover, should Jarvis recover from Dr. Webb at trial, the terms of his application require him to pay back the monies he received from the ISP Pension Program. *Record* at 317A. *Riverview* does not bar Jarvis' claim.

### III. DUTY TO COMMIT

The final issue for our review is the question of Dr. Webb's duty to have Neal committed. Jarvis argues Dr. Webb had a duty to have Neal committed on the basis of IND.CODE 16-14-9.1-7, the emergency psychiatric detention statute.

 IND.CODE 16-14-9.1-7 does not place physicians under a duty to com-

mit. Rather, it merely requires the inclusion of a physician's statement that "a person may be mentally ill and dangerous" in the application for emergency detention. Jarvis also directs us to several holdings from our sister jurisdictions in which a duty to commit has been found. We decline to find such a duty in this case for two reasons.

First, the creation of a duty to commit will create two concomitant evils. Patients, not desirous of being committed, will tend to avoid their mental health care providers and deprive themselves of needed therapies. In turn, the providers, fearing liability, are likely to err on the side of committing someone rather than attempting out-patient therapy, thereby putting at risk the important liberty interest of their patients. Second, our legislature specifically avoided creating a duty to commit when it enacted IND.CODE 16-14-9.1-7. In other words, our legislature has determined, albeit silently, no duty to commit should exist, and we are loath to disagree. Accordingly, the judgment of the trial court on this issue is reversed and remanded with instructions to the trial court to enter summary judgment in favor of Dr. Webb on this issue.

In all other respects, the judgment of the trial court is affirmed and the cause is remanded for further proceedings consistent with this opinion.

RATLIFF, C.J., and ROBERTSON, J., concur.

---

8. We include the following discussion in the text because Dr. Webb's argument on this point appears to be a tangential attack on the trial court's jurisdiction over Jarvis' claim.